Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

ORIGINAL

FILED
CLERK US DISTRICT COURT
4-8-02
APR - 8 2002
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Topa Equities, Ltd. Plaintiff, vs. City of Los Angeles, Defendant. | ) | CV 00-10455-GHK(RNBx) **MEMORANDUM and ORDER Joint Briefing re: Los Angeles Rent Stabilization Ordinance** |

This matter is before the court on the parties' Joint Brief re: Preemption of Los Angeles Rent Stabilization Ordinance. After fully considering the briefs and papers pertaining to these matters, hearing oral argument from counsel on August 20, 2001, and reviewing the post-hearing supplemental briefing, we rule as follows:

**I. Background**

Plaintiff Topa Equities, Ltd. ("TOPA") filed suit against the City of Los Angeles ("City") on September 28, 2000. TOPA seeks a declaration that the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA") preempts certain provisions of the 1990 Amendments to the Los Angeles Rent Stabilization Ordinance

ENTERED ON ICMS
APR - 9 2002

33

("LARSO"). TOPA also seeks an injunction preventing enforcement of those provisions. In particular, TOPA asserts that the maximum rent, L.A.M.C. § 151.02, and the vacancy decontrol, L.A.M.C. § 151.06(c), provisions of LARSO conflict with Congress' intent to permit prepayment of mortgages under § 236 of the National Housing Act.

**A. Overview of the Federal Statutory Scheme**

The goal of the national housing policy is to provide "a decent home and a suitable living environment for every American family." 42 U.S.C. §§ 1441; accord 42 U.S.C. § 1441a(a); 12 U.S.C. 1701t. Any prepayment right is part of this larger scheme to create affordable low income housing in the United States. Congress and the Department of Housing and Urban Development ("HUD"), as the relevant regulatory agency, have enacted the following laws and regulations which implement the national housing policy and affect TOPA's alleged prepayment right.

*1. National Housing Act*

Congress passed the National Housing Act ("NHA") in 1934. Initially, it subsidized projects developed, owned and managed by local authorities. See Chancellor Manor v. United States, 51 Fed. Cl. 137, 140 (2001). Congress later authorized HUD to implement the national housing policies. In 1968, Congress amended the NHA by adding § 236, 12 U.S.C. § 1715z-1, which provides mortgage interest subsidies to private owners developing low income housing. See id. In exchange, HUD limits the amount owners can charge for rent and the amount of operating profits the owners can obtain. See id.

2. *24 C.F.R. § 221.524*

In 1970, HUD enacted regulations permitting prepayment of the forty-year, § 236-subsidized mortgages after only twenty years. See 24 C.F.R. § 221.524(a)(ii). The regulations included the following language with respect to prepayment:

> A mortgage indebtedness may be prepaid in full and [HUD's] controls terminated without the prior consent of [HUD] . . . where the prepayment occurs after the expiration of 20 years from the date of the final endorsement of the mortgage . . . .

Id.

3. *Emergency Low Income Housing Preservation Act*

The Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA") was enacted by Congress out of a growing concern that many owners of HUD projects would prepay their loans under 24 C.F.R. § 221.524, which Congress believed would severely deplete the stock of low income housing. 12 U.S.C. § 17151. ELIHPA effectively placed a two-year moratorium on prepayment rights. However, prepayment was permitted "in accordance with a plan of action approved by [HUD]." ELIHPA § 221(a), 101 Stat. 1878-79. HUD could only approve prepayment upon a written finding that any prepayment would have minimal impact upon the availability of low income housing. Id. at § 225(a).

4. *LIHPRHA*

On November 28, 1990, Congress enacted the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"). Similar to ELIHPA, LIHPRHA only permitted prepayment with HUD's approval. See 12 U.S.C. § 4101(a) (stating that owners "may prepay, and mortgagee[s] may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by [HUD]."). HUD could only approve mortgage prepayment after a written finding that

prepayment would have minimal impact on the availability of affordable low income housing in the particular market served by the project. 12 U.S.C. § 4108. LIHPRHA also permitted HUD to offer incentives to owners to remain in the HUD program for the useful life of the property, thereby preventing prepayment. Id. at § 4109. If HUD approved an action plan to retain a participant in the program, but did not provide the needed funding within fifteen months, the owner could prepay the mortgage and exit the federal program. 12 U.S.C. § 4114(a)(1).

5. *Housing Opportunity Program Extension Act*

In March 1996, Congress passed the Housing Opportunity Program Extension Act ("HOPE"), which lifted the prepayment restrictions imposed by ELIHPA and LIHPRHA. P.L. 104-120, § 2(b)(1), 110 Stat. 834. HOPE permitted prepayment of § 236 mortgages so long as owners agreed not to raise rents for at least sixty days after prepayment. Id.

**B. Los Angeles Rent Stabilization Ordinance**

LARSO went into effect on May 1, 1979. LARSO's purpose is "to regulate rents so as to safeguard tenants from excessive rent increases, while at the same time providing landlords with just and reasonable returns from their rental units." LARSO § 151.01; see also Palos Verdes Shores Mobile Estates, Ltd. v. City of L.A., 142 Cal. App. 3d 362, 369 (1983). In 1990, the Los Angeles City Council amended LARSO. The City asserts the amendments were not substantial revisions, but simply clarifications of existing law. See Los Angeles, Cal., Ordinance 166320 § 4 (Nov. 22, 1990). The amendments provide that exempt rental units become immediately subject to LARSO upon termination of federal regulation and that such units are not

subject to vacancy deregulation during any transition period. Id.; see also L.A.M.C. §§ 151.02, 151.06(c). TOPA asserts that the primary purpose of the 1990 amendments was to preserve low income rentals in Los Angeles by capturing government assisted housing at below-market rental rates as soon as the properties left the federal program. Joint Brief, pp. 7-8.

While participating in the HUD program, TOPA was exempt from LARSO's definition of "Rental Units". See L.A.M.C. § 151.02.[1] Once TOPA exited the federal program, the exemption no longer applied. As a result, TOPA focuses on two provisions of the 1990 amendments to LARSO, which the City contends restricts TOPA's base rents.

The first LARSO provision TOPA seeks to preempt is L.A.M.C. § 151.02, which defines maximum rent as:

> The highest legal monthly rate of rent which was in effect for the rental unit during any portion of the month of April 1979. If a rental unit was not rented during said month, then it shall be the highest legal monthly rate of rent in effect between October 1, 1978 and March 31, 1979. If a rental unit was not rented during this period, then it shall be the rent legally

---

[1] Subdivision 5 of the definition of Rental Units exempts:

> Housing accommodations which a government unit, agency or authority owns, operates, or manages, or which are specifically exempted from municipal rent regulation by state or federal law or administrative regulation, or as to which rental assistance is paid pursuant to [HUD's Section 8 Federal Rent Subsidy Program]. This exception shall not apply once the governmental ownership, operation, management, regulation, or rental assistance is discontinued.

TOPA was exempt under subdivision 5 because HUD's Regulatory Agreement with TOPA established and limited the monthly rent, thereby exempting the project from LARSO. See Def.'s Reply, Ex. D.

> in effect at the time the rental unit was or is first rerented after the effective date of this chapter. Where a rental unit was exempt from the provisions of this chapter under Subdivision 5 of the definition of "Rental Units" in this section, the maximum rent shall be the amount of rent last charged for the rental unit while it was exempt.

L.A.M.C. § 151.02 (emphasis added to reflect the 1990 amendment).

The second section of LARSO that TOPA seeks to preempt is the vacancy decontrol provision. As to most properties, Section 151.06(c) states that:

> [I]f [a] rental unit [is] vacated voluntarily or as a result of an eviction or termination of tenancy . . . the maximum rent or maximum adjusted rent may be increased to any amount upon the re-rental of the rental unit. Thereafter, so long as the rental unit continues to be rented to one or more of the same persons, no other rent increase shall be imposed pursuant to this subsection.

The 1990 amendment, however, provides that the vacancy decontrol provision would not apply "[i]f a rental unit is vacated as a result of the termination of the regulation of the rental unit under any local, state, of federal program." Id. at subsection 5.

Although these provisions establish base rents, LARSO includes provisions to adjust rents so that an owner may obtain a fair and reasonable return on its investment. See L.A.M.C. § 151.07(B)(1).[2]

---

[2] Section 151.07(B)(1) gives Hearing Officers authority to grant rent increases if the "officer finds that such increase is in keeping with the purposes of this chapter and that the maximum rent or maximum adjusted rent otherwise permitted . . . does not constitute a just and reasonable return on the rental unit or units." TOPA has not applied for any increases under § 151.07(B)(1). See Richman Decl. ¶ 16. Instead TOPA contends that its base rents should not be limited by the maximum rent and vacancy decontrol provisions of the 1990 amendments. See, e.g., Joint Brief, pp. 8-9.

**C. TOPA**

TOPA entered into a Regulatory Agreement with HUD under § 236 of the NHA on July 12, 1971 for the Morten Gardens Apartments. TOPA obtained a HUD-subsidized forty-year mortgage, making TOPA's effective interest rate one percent. The Regulatory Agreement does not include any prepayment right.[3]

On February 1, 1994, TOPA applied for a new plan of action under LIHPRHA, which HUD approved on August 1, 1995. Due to reductions in LIHPRHA funding, TOPA's plan was never funded. It never received the increased rents or other HUD approved incentives under LIHPRHA. On January 22, 1998, TOPA gave the required statutory notice and prepaid its § 236-subsidized mortgage under HOPE. In 2000, the Housing Authority of Los Angeles informed TOPA that, pursuant to LARSO, it must roll-back rents to the amounts charged under § 236. TOPA contends LIHPRHA preempts the maximum rent and vacancy decontrol provisions of LARSO's 1990 amendments.

**II. Preemption**

Under the Supremacy Clause, laws interfering with or contrary to federal laws are preempted. U.S. Const., Art VI, cl.2, Gibbons v. Ogden, 22 U.S. (9 Wheat) 1 (1824); Fid. Fed. Sav. & Loan Assoc. v. de la Cuesta, 458 U.S. 141, 152-53 (1982) (citations omitted). The

---

[3] The Note accompanying the Deed of Trust did permit prepayment, but included a standard mortgage prepayment penalty. See Compl., Ex. C. ("In the event of prepayment of principal during any one calendar year in an amount in excessive of 15 percent of the original principal amount of the note [the mortgagor is] bound to pay . . . a premium or charge equal to 3 percent of the amount of such excess less 1/8 of 1 percent for each 12-month period which has elapsed since the date of this note.").

Supreme Court recognizes three types of preemption: express, field[4] and conflict preemption. See Fid. Fed. Sav. & Loan Assoc., at 153.

The Ninth Circuit has recognized that the different categories of preemption are not "rigidly distinct" and that the ultimate touchstone of preemption analysis is the intent of Congress, which can be expressly stated or implied from the structure and purpose of a statute. Williamson v. Gen. Dynamics Corp., 208 F.3d 1144, 1150 (9th Cir. 2000) (citing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992)); see also Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992).

The party asserting preemption must overcome a high burden to show Congress' intent to preempt state or local law. See Medtronic Inc. v. Lohr, 518 U.S. 470, 485 (1996) ("We have long presumed that Congress does not cavalierly pre-empt state law . . . ."). Preemption analysis begins "with the assumption that the historic police powers of the States were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress." Id.; see also Indus. Truck Ass'n, Inc. v. Henry, 125 F.3d 1305, 1309 (9th Cir. 1997) (citations omitted). "Moreover, 'preemption of state law by federal statute or regulation is not favored in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so

---

[4] We omit any discussion of field preemption because neither party has raised it. Additionally, Congress has not entirely occupied the field of housing. See, e.g., Rowe v. Pierce, 622 F. Supp. 1030, 1033 (D.D.C. 1985) ("Housing is an area where Congress intended . . . two complementary systems of regulations to supplement each other with local law providing the general background law and federal law intervening only where federal involvement is deemed necessary.").

ordained.'" Irwin v. Mascott, 96 F. Supp. 2d 968, 973-74 (N.D. Cal. 1999) (quoting Chi. & N.W. Trucking Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317 (1981)).

**III. Express Preemption**

TOPA does not invoke express preemption.[5] In any event, express preemption does not apply in this case. Unlike LIHPRHA, the NHA, 24 C.F.R. § 221.524, and HOPE do not contain any express preemption language.

TOPA concedes it prepaid its mortgage under HOPE. Pl.'s Joint Brief, p.6 ("TOPA gave notice and prepaid its § 236 mortgage on January 22, 1998 under HOPE."). Although TOPA applied for incentives under LIHPRHA and its plan of action was approved, the project was never funded. As a result, TOPA never operated under LIHPRHA's incentives or prepaid as permitted under LIHPRHA. Therefore, LIHPRHA's preemption provision does not expressly apply to this case. See Kenneth Arms Tenant Assoc. v. Martinez, 2001 U.S. Dist. LEXIS 11470, at * 25-26 (E.D. Cal. July 3, 2001) (finding that express preemption provision of 12 U.S.C. § 4122 was not applicable because the property never operated under LIHPRHA).

**IV. Conflict Preemption**

State law is preempted to the extent it actually conflicts with federal statutes or the Constitution. Barnett Bank of Marion County v. Nelson, 517 U.S. 25, 31 (1996). Conflict preemption occurs when it is "impossible for a private party to comply with both state and

---

[5] Notwithstanding its occasional arguments that resemble claims of express preemption, TOPA eschews reliance on express preemption. See Joint Brief, p. 10 (only arguing that conflict preemption applies). Consequently, we view TOPA's arguments as only raising conflict preemption.

federal requirements" or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1997) (internal quotations omitted).

**A. Congressional Intent**

Congressional intent is primarily "discerned from the language of the . . . statute and the 'statutory framework' surrounding it." Medtronic Inc. v. Lohr, 518 U.S. 470, 485-86 (1996) (citations omitted). When construing Congressional intent, statutes must be read in relation to their placement in the overall statutory scheme. See id. at 486 (1996). Therefore, LIHPRHA and HOPE must be analyzed in the larger context of the NHA and § 236 in particular.

TOPA asserts that allowing owners to prepay their mortgages and exit the federal program was a Congressional goal. See Pl.'s Supp. Brief re: Governmental Intent, pp. 2-3. TOPA thus believes the maximum rent and vacancy decontrol provisions of LARSO are preempted because they intentionally interfere with the Congressional objective of encouraging private participation in low income housing by allowing participants to prepay subsidized mortgages and exit the program.[6] In the alternative, TOPA asserts that if prepayment was not a goal, it was an important facet of the program to induce private participation.

However, neither this alleged goal nor the assertion that prepayment was a necessary inducement for private participation is borne out by the structure or legislative history surrounding the

---

[6] TOPA concedes that there is "scant" evidence of Congressional intent prior to ELIHPA. Id. at p. 8. Although TOPA references a few statements contained within ELIHPA's legislative history, the parties primarily focus on LIHPRHA and its legislative history.

relevant laws and regulations, with the exception of LIHPRHA. Furthermore, the subsequent enactment of HOPE obscures any policy or intent evidenced by LIHPRHA.

1. *Section 236 of the NHA*[7]

TOPA argues that prepayment was an integral part of § 236 of the NHA and necessary to induce private participation. However, nothing in § 236 itself or in its legislative history supports TOPA's assertion.

Federal courts have repeatedly recognized that Congress intended the NHA primarily to benefit residents of low income housing, not commercial developers. See Chancellor Manor L.P. v. United States, 51 Fed. Cl. 137, 154 n.3 (2001) (citing United States v. Harvey, 68 F. Supp. 2d 1010, 1016-17 (S.D. Ind. 1998); United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1103 n.3 (D. Del. 1988); United States v. Winthrop Towers, 628 F.2d 1028, 1036 (7th Cir. 1980); Ceder-Riverside Assoc. v. City of Minneapolis, 606 F.2d 254, 258 (8th Cir. 1979); M.B. Guar. Co. v City of Akron, 546 F.2d 201, 204 (6th Cir. 1976)). The NHA's stated purpose is to provide "a decent home and a suitable living environment for every American family," 42 U.S.C. § 1441; accord 42 U.S.C. § 1441a(a); 12 U.S.C. § 1701t. The text of § 236 does not include any prepayment right nor does it even implicitly reference one. Moreover, neither party has offered any evidence that in the enactment of § 236, Congress intended to

---

[7] The NHA was enacted in 1934 and has been subject to numerous amendments. The subsidized mortgage interest programs at issue were created by § 236, which is where we begin our analysis of congressional intent.

guarantee a prepayment right or permit an owner to exit from the government program at market rates.

TOPA then argues that if prepayment was not a goal, it was a method Congress utilized to obtain private participation, which was clearly a goal of the NHA. Similarly, no legislative history from that time indicates that Congress intended prepayment to be an important method for obtaining private participation. If anything, the fact that Congress required a forty-year, instead of a twenty-year, mortgage indicates its preference that owners remain in the program for the entire forty years. Viewed as a whole, § 236 does not evidence any concern, much less intent, by Congress that prepayment after twenty years be an essential inducement in realizing the goal of increasing low income housing by private participation.

Because the right to prepay was not part of § 236, but was actually initiated by HUD through a regulation, the legislative history of § 236 does little to inform the purpose of any prepayment right.

2. *24 C.F.R. § 221.524(a)*

Federal regulations can preempt state and local laws. Fid. Fed. Sav. & Loan v. de la Cuesta, 458 U.S. 141, 153-54 (1982). "Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review *only* to determine whether he has exceeded his statutory authority or acted arbitrarily." Id. at 153-54. Congress need not expressly authorize an agency to preempt state law. Id. Instead we should focus on whether (1) the agency

meant to preempt the relevant state law and (2) such action was within the scope of the agency's delegated authority.[8] Id.

24 C.F.R. § 221.524[9] does not clearly state any intent by HUD to preempt state law. Moreover, beyond the actual text, both parties agree that there is "scant legislative history behind HUD's regulation." Pl.'s Supp. Brief, p.6. Upon close review, no contemporaneous legislative history exists that indicates HUD's intent to preempt relevant state laws, such as LARSO.

Although TOPA asserts this section on its face demonstrates the requisite intent, TOPA fails to distinguish between a right to prepay and thereby exit the federal program, and the right to prepay and obtain exemption from local ordinances. This regulation does not provide any evidence of HUD's intent to convey the latter right.

TOPA has not borne its burden of showing that HUD's intent was to preempt local rent control ordinances when it promulgated 24 C.F.R. § 221.524.

3. LIHPRHA

a. *Section 4122*

TOPA's argument almost exclusively focuses on the text of LIHPRHA and its legislative history. TOPA does not argue that 12 U.S.C.

---

[8] The City argues that the HUD Secretary is without authority to preempt state law because the federal statute did not delegate "the authority to preempt local police power regulations *after* prepayment." Def.'s Supp. Brief re: Legislative History, p. 6 (emphasis in original). However, "a pre-emptive regulation's force does not depend on express congressional authorization to displace state law." Fid. Fed. Sav. & Loan, 458 U.S. at 154. Additionally, we need not decide this issue, as we find that 24 C.F.R. § 221.524 does not preempt LARSO.

[9] See supra, at p. 3, for the text of the regulation.

§ 4122(a) expressly preempts LARSO. Instead, under conflict preemption, TOPA asserts that the preemption provision of § 4122(a) is evidence of Congress' intent to permit unfettered prepayment within the overall statutory scheme of the NHA. See Jt. Briefing, p. 16.

While both express and conflict preemption turn on congressional intent, under express preemption, "Congress' command is explicitly stated in the statute's language," where under conflict preemption, Congress' command is "implicitly contained in its structure and purpose." See Gade v. Nat'l Solid Wastes Management, 505 U.S. at 98 (citations omitted). Because the parties are not relying upon express preemption, we must look beyond the language of LIHPRHA's preemption clause to the entire statutory framework of the NHA and LIHPRHA to determine if an unfettered right to prepayment was a goal of the NHA or a necessary inducement for private participation. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86 (1996).

12 U.S.C. § 4122 reads in relevant part:

> (a) In general
> No State or political subdivision of a State may establish, continue in effect, or enforce any law or regulation that--
> (1) restricts or inhibits the prepayment of any mortgage described in section 4119(1) of this title . . . on eligible low income housing . . .
> . . . .
> (3) is inconsistent with any provision of this subchapter, including any law, regulation, or other restriction that limits or impairs the ability of any owner of eligible low income housing to receive incentives authorized under this subchapter (including authorization to increase rental rates, transfer the housing, obtain secondary financing, or use the proceeds of any of such incentives); or
> (4) in its applicability to low-income housing is limited only to eligible low-income housing for which the owner has prepaid the mortgage or terminated the insurance contract.
>
> Any law, regulation, or restriction described under paragraph (1), (2), (3), or (4) shall be ineffective and any eligible low-income housing exempt from law, regulation, or restriction, only to the extent it violates the provisions of this subsection.

> (b) Effect
> This section shall not prevent the establishment, continuing in effect, or enforcement of any law or regulation of any State or political subdivision of a State not inconsistent with the provisions of this subchapter, such as any law or regulation relating to . . . rent control . . . to the extent such law or regulation is of general applicability to both housing receiving Federal assistance and nonassisted housing.

TOPA contends that this language clearly reveals Congress' intent to preempt rent control ordinances like LARSO, which allegedly inhibit the right to prepay and specifically target government funded projects.[10]

TOPA also argues that LIHPRHA and this language evidence Congress' broader goal to compensate owners. Pl.'s Supp. Brief, p. 10-12. "[T]he promise of the ability to raise rents to market level after 20 years and the opportunity to recoup their investment . . . motivated many of the owners like TOPA to participate in the Federal low income housing program." Pl.'s Supp. Brief, pp. 2-3.[11] Thus TOPA argues that it was this bargain LIHPRHA attempted to effectuate by providing compensation to the owners. Id. at pp. 10-12. According to TOPA, LIHPRHA provides this compensation

---

[10] The City argued that §§ 151.02 and 151.06(c) are laws of general applicability and therefore are not preempted. We need not reach this issue at this time because we have concluded, on a separate basis, that LARSO is not preempted.

[11] TOPA asserts that if properties are constrained by LARSO, it will no longer be economically feasible to prepay HUD mortgages. Yet the owners only have an option to prepay, with limited protection from certain types of local ordinances aimed specifically at prepayment. LIHPRHA does not protect against other conditions that would make prepayment undesirable. With only this limited protection, the owners decide whether to exercise their option to exit HUD programs or whether to continue to enjoy the one percent subsidized mortgages and maintain their exemption from LARSO.

through either the payment of incentives or the return of the owners' right to prepay, which permitted owners to charge market rents for their properties. Id. at 11.

However, TOPA mischaracterizes the breadth of LIHPRHA and its preemption clause. LIHPRHA only permitted prepayment under limited conditions. See, e.g., 12 U.S.C. § 4108(a). Moreover, the plain meaning of § 4122(a) and 4122(b), when read together, does not guarantee owners market level rents or the unfettered right to prepay. Section 4122(a)(1)-(4) is limited by § 4122(b), which states that laws of general applicability are not preempted, a point which is conceded by TOPA. Pl.'s Supp. Brief, p. 7. However, rent control ordinances of general applicability may require owners to charge below-market rents, thereby interfering with an owner's alleged right of "compensation". Under section 4122(b) these laws are not preempted. Therefore, even the plain meaning of § 4122(a) when read with the limitations of § 4122(b) does not support a finding that Congress broadly intended to permit unfettered prepayment or guarantee all owners market level rents upon prepayment. Instead, LIHPRHA's preemption provision is drawn narrowly and must be read in the context of the entire act and its legislative history.

*b. LIHPRHA's Balance and Legislative History*

At the time LIHPRHA was enacted, Congress feared the twenty-year prepayment right would result in the loss of hundreds of thousands of low income rental units. Sen. Rep. No. 101-625, at 31 (1990). LIHPRHA was a political compromise designed to

> provide a *balanced* national policy: one that improves tenant-based rental assistance but also expands the supply of affordable housing; one that emphasized rehabilitation of existing housing but also supports construction and acquisition where appropriate; one that targets resources on the most needy but also recognizes the need to make decent housing more affordable to working families and first-time home buyers.

Id. at 19 (emphasis in original).

Overall, Congress attempted to balance the tenants' rights with those of owners. 136 Cong. Rec. 20886 (1990).

Although TOPA argues prepayment was integral to the NHA, as evidenced by LIHPRHA,[12] the Congressional record reveals conflict on the issue of whether owners had a contractual right to prepay. The June 21, 1990 House Committee Report states:

> The Committee continues to be concerned that where owners wish to prepay their mortgages tenants not be unduly harmed. The problem confronting this Committee is how to balance the public policy need to preserve housing for low income families with perceived contractual rights of the owners, particularly in light of the lack of production of affordable housing over the last ten years. There was sharp disagreement within the Committee about the issue of contractual rights. The provisions of this bill take into consideration the competing interests of the owners, the tenants, and the Federal government. The bill, however, should not be construed to mean that the government favors prepayment over preservation of the affordable housing stock.

H.R. Rep. No. 101-559, p. 15 (1990).

Instead of an unfettered right to prepayment, LIHPRHA offered owners four alternatives: (1) apply to HUD for additional incentives

---

[12] Ironically, TOPA asserts that LIHPRHA, a program which has as its main purpose the preservation of low income housing, is in fact unambiguous evidence that Congress intended to permit owners to prepay and exit the program after twenty years. The mere existence of ELIHPA and LIHPRHA provide at least some indication that Congress did not intend for prepayment to be an unfettered right. In fact, Congress criticized then President Bush's housing plan because it did not do enough to "avert prepayments and conversion to market-rate housing in tight rental markets, leading to significant tenant displacement." S. Rep. No. 101-316, p. 108.

in exchange for extending the low income use restrictions for the useful life of the property, 12 U.S.C. § 4109; (2) sell the property to a qualified purchaser, 12 U.S.C. § 4110; (3) prepay the mortgage upon HUD approval, 12 U.S.C. § 4108; or (4) remain in the program without any additional incentives.

The first three alternatives required owners to create an action plan for HUD approval. For example, Congress only authorized HUD to approve prepayment upon a written finding that the plan of action would not (1) "materially increase economic hardship for current tenants," (2) increase rents above a predetermined percentage of the tenant's income, (3) "involuntarily displace current tenants where comparable and affordable housing is not readily available," and (4) materially affect the availability of comparable, vacant, decent, safe, and sanitary housing. 12 U.S.C. § 4108(a). Owners electing to prepay in low-vacancy areas were also required to permit tenants to remain for a period of three years at the rent levels existing at the time of prepayment, except for increases to cover higher operating costs. 12 U.S.C. §§ 4113(1), (3). These requirements and limitations were meant to protect tenants and the availability of low income rental housing.

To balance the rights provided to tenants, some concessions were given to owners. LIHPRHA included additional incentives that provide owners greater returns if they committed to low income housing for the useful life of the property. These incentives helped compensate owners and ensured the property could be properly maintained. See 12 U.S.C. §§ 4109, 4112.

As part of this balance, owners who prepaid were provided with limited protection from local laws that explicitly targeted properties

prepaying under LIHPRHA. Congress wanted to protect owners who prepaid from state or local prepayment penalties, including criminal sanctions. See 12 U.S.C. § 4122(a)(4); see e.g. HUD Preservation and Prepayment Issues, Hearing on H.R. 1180 Before the House Comm. on Banking, Finance, and Urban Affairs, 101st Cong. 165 (1990) (statement of Charles Edson, Counsel, National Leased Housing Association). This limited preemption clause secured the owners' prepayment rights and maintained the delicate balance of LIHPRHA.

In light of this desired balance, the preemption clause was narrowly drawn. As noted above, state and local laws of general applicability are not preempted. Moreover, the scope of preemption is limited to the extent that a law actually conflicts with § 4122(a).[13]

Overall, LIHPRHA's preemption language indicates a limited intent to preempt state and local law. However, LIHPRHA only represents one aspect of the Congressional scheme under the NHA. Therefore, LIHPRHA's preemption clause must be examined alongside of HOPE, which subsequently negated the preemptive effect and prepayment limitations of LIHPRHA.

---

[13] Representative Carper's statement explaining the purpose of the preemption clause reinforces this view:

> The first thing that we want to do - we believe in our committee print that we have preempted too many State and local laws. We have given certain privileges and certain rights to the owners of these affected properties that they do not deserve, and our amendment simply says that the owners of these properties will face those special burdens if they prepay. By the same token, they will have no special advantages.

136 Cong. Rec. 10886 (1990).

*4. HOPE*

HOPE lifted LIHPRHA's restrictions by permitting owners to prepay provided they agreed not to increase rents for sixty days. See H.R. Rep. 2099 (1995). HOPE and its legislative history do not clearly explain whether it is simply another aspect of LIHPRHA's balance or is an entire dismantling of LIHPRHA and its restrictions.[14]

TOPA contends that HOPE was simply a continuation of LIHPRHA's two-part program to compensate owners either through incentives or the right of prepayment. Pl.'s Supp. Brief, p. 12. In the mid 1990s, Congress stopped funding LIHPRHA action plans, and owners were no longer able to obtain additional incentives. TOPA contends that while the first component of LIHPRHA was dismantled due to lack of funding, Congress preserved the right to compensation through prepayment, which

---

[14] Without any legal authority, the City contends that LIHPRHA has been impliedly repealed because it no longer receives federal funding. The express statutory language of HOPE does not repeal LIHPRHA. A statute may be repealed by implication in certain narrow circumstances, but "[i]t is . . . a cardinal principle of statutory construction that repeals by implication are not favored." Radzanower v. Touche Ross & Co., 426 U.S. 148, 154 (1976)(quoting United States v. United Continental Tuna Corp., 425 U.S. 164, 168 (1976)); see also Lujan-Armendariz v. INS, 222 F.3d 728, 743 (9th Cir. 2000). Repeal by implication may occur:

> (1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute . . . . But in either case, the intention of the legislature to repeal must be clear and manifest.

Radzanower, 426 U.S. at 154.

In this case, LIHPRHA and HOPE are not in complete "irreconcilable" conflict, and there is no clear Congressional intent. Although HOPE allows prepayment, and LIHPRHA restricts prepayment, certain properties still function under LIHPRHA's scheme.

necessitates the maintenance of LIHPRHA's preemption provision. Id. We disagree.

HOPE makes no mention of LIHPRHA's preemption clause. Rather than preserving LIHPRHA's bargain as TOPA asserts, the legislative history suggests that, for varying reasons, Congress dismantled LIHPRHA's balance, thereby obviating the need for preemption.

At least some of the legislative history indicates Congress was greatly concerned with the increased cost of HUD's low income housing programs and HUD's discretionary spending. See Sen. Rept. 104-140, at * 6-7 (Sept. 13, 1995). Other sections of the legislative history reflect the belief that LIHPRHA's scheme was unnecessary and ineffective.

> During the mid-1980s large numbers of mortgages became eligible for prepayment, causing concern that many owners would exit the program and result in a shortage of project-based housing stock . . . . The program should be eliminated due to the inefficiency . . . . [T]he incentives are being awarded to owners who may have no intention of prepaying . . . . [I]n today's real estate market, the prospect of widespread prepayment of mortgages is unlikely.

H.R. Rep. 104-120, at *103 (1995); see also H.R. Rep. 104-120, at * 103-04.

Thus, it is far from clear that in enacting HOPE, Congress sought to maintain LIHPRHA's balance, including its preemption clause.

HOPE's legislative history does not clearly support TOPA's theory. The statements and competing goals in the legislative history indicate that, in fact, Congress may have considered LIHPRHA unnecessary. In any event, TOPA has not borne its burden of demonstrating clear congressional intent to convey an unfettered prepayment right and preserve LIHPRHA's preemption clause.

**B. TOPA's Failure to Meet Its Burden**

TOPA has extracted isolated sections from the legislative history to demonstrate that prepayment was a Congressional goal or a necessary inducement for private participation. See, e.g., Pl.'s Supp. Brief re: Governmental Intent, pp. 4-5 (quoting Secretary Cushing's testimony to the House Subcommittee on Housing and Community Development regarding prepayment rights). Other portions of the legislative history indicate Congress was not concerned with prepayment, and the primary goal was providing affordable housing. See 136 Cong. Rec. s14089-01 (1990) (statement of Senator Cranston) (stating that prepayment "was not a bargain[ed] for term. Owners did not pay consideration to get that in the contract."). Therefore, TOPA's submissions do not constitute clear evidence of Congressional intent. See Coalition for Clean Air v. United States Envtl. Prot. Agency, 971 F.2d 219, 227 (9th Cir. 1992) ("It is the official committee reports that provide the authoritative expression of legislative intent . . . . Stray comments by individual legislators, not otherwise supported by the statutory language or committee reports, cannot be attributed to the full body that voted on the bill.") (quoting In re Kelly, 841 F.2d 908, 912 n.3 (9th Cir. 1988)).

The only clear Congressional goal that can be derived from the various statutes, regulations, legislative history, and the overall structure of the NHA is to provide low income housing. Although mortgage subsidies were one method used by Congress and HUD, an unrestricted prepayment right is not clearly part of Congress' intent. See supra, § IV(A).

Overall, the legislative history does not clearly and manifestly evidence Congress' intent to provide for unfettered prepayment or

guarantee owners market rental rates on their properties. A review of LIHPRHA and its history indicates that prepayment was not a goal or even an essential incentive to the NHA as a whole. Rather, it was a short-term remedy to a then perceived need, which has been repudiated by HOPE. Therefore, TOPA has failed to provide evidence of Congress' intent and has failed to meet its burden to show preemption.

**V. Cienega Gardens**

TOPA strongly relies upon Cienega Gardens v. United States, 38 Fed. Cl. 64 (1997), because it is the only case to directly address whether the NHA and LIHPRHA preempt LARSO.

**A. Procedural History**

In Cienega Gardens I, Plaintiffs brought claims against the federal government alleging breach of contract, a deprivation of property in violation of the Fifth Amendment, and an unlawful administrative action. 33 Fed. Cl. 196, 202 (Fed. Cl. 1995). The Plaintiffs had not prepaid or operated under ELIHPA or LIHPRHA. Instead Plaintiffs asserted that the mere enactment of ELIHPA and LIHPRHA breached the provision in an agreement between the owners and HUD that permitted prepayment after twenty years. Id. at 205. Plaintiffs also alleged that the restrictions constituted a Fifth Amendment violation because they prevented Plaintiffs from putting their property to profitable uses. Id.

The trial court found that the plaintiffs entered into a regulatory agreement and deed of trust with the federal government. 33 Fed. Cl. at 206-07. The agreement obligated plaintiffs to restrict the use and management of their property in exchange for benefits, including the right to prepay and be free from federal regulation after twenty years. Id. at 207. The court held that the government

breached its contract with the plaintiffs upon the enactment of ELIHPA and LIHPRHA. Id. at 213.

Cienega Gardens III[15] was devoted to the calculation of damages as a result of the federal government's purported breach of contract. 38 Fed. Cl. 64. The government contended that the alleged damages should be reduced because LARSO limited the rents plaintiffs were permitted to charge. Id. at 82. The court held LIHPRHA preempted LARSO, and therefore, the damages were not reduced. Id.

Cienega Gardens III was reversed by the Federal Circuit in Cienega Gardens v. United States, 162 F.3d 1123 (Fed. Cir. 1998). The Federal Circuit found no privity of contract and therefore no breach by the government. Thus, issues of damages and LARSO preemption were moot and not addressed. Upon remand, the trial court issued a partial summary judgment in the government's favor dismissing the plaintiffs' takings claim as unripe. Plaintiffs had failed to exhaust their administrative remedies by not applying to HUD for incentives under LIHPRHA. Cienega Gardens v. United States, 46 Fed. Cl. 506 (2000).

On appeal, the Federal Circuit found that applying to HUD for administrative relief under ELIHPA or LIHPRHA would have been futile because HUD lacked the discretion to approve prepayment of these projects. 265 F.3d 1237 (Fed. Cir. 2001). Therefore, the takings claim was ripe. The court briefly discussed LARSO preemption because the government argued HUD should have determined whether LARSO was preempted. The government argued that plaintiffs failed to exhaust their administrative remedies because they did not request HUD to

---

[15] Cienega Gardens II, 37 Fed. Cl. 79 (1996), concerned defendant's motion for partial summary judgment and a cross motion for summary judgment filed by plaintiffs who had joined the action after the court decided Cienega Gardens I.

examine the preemption issue first. The court found the plaintiffs' issues were ripe because they could seek the trial court's determination of preemption instead of submitting the question to HUD. Id. at 1247. The court did not address the validity of the trial court's finding of preemption, stating "[t]he present appeal does not require us to rule upon whether LIHPRHA does indeed preempt LARSO." Id. at 1247. Consequently, the appellate court did not affirm, nor did it reverse, the trial court's ruling on preemption in Cienega Gardens III. 38 Fed. Cl. 64.

**B. Preemption Analysis in Cienega Gardens III**

In Cienega Gardens III, the trial court held that LIHPRHA preempts LARSO because: (1) LIHPRHA's express preemption provisions demonstrate Congressional intent to preempt LARSO; (2) LARSO prevents prepayment because below-market rents would diminish cash flow and make it difficult to obtain refinancing; and (3) LARSO interferes with Congressional intent to permit prepayment as indicated in the original contracts between the owners and HUD. 38 Fed. Cl. at 65-70. The court's holding was premised on the assumption that owners had a guaranteed prepayment right, which was designed to induce participation in low income housing programs. Id. at 83 ("A major facet of the federal housing program was to permit owners to prepay their mortgages after the 20-year anniversary date . . . . These significant expectations and inducements are inherent to the federal scheme.").

While well considered, we find the court's opinion unpersuasive and respectfully disagree. First, on appeal, the Federal Circuit stated that no privity of contract existed between the owners and HUD based on the deed of trust notes. Cienega Gardens v. United States,

162 F.3d 1123, 1133-36 (Fed. Cir. 1998). The court found that the prepayment terms relied upon by the Plaintiffs were contained in riders attached to the deed of trust notes. These documents were not binding on HUD because HUD was not a party to those agreements. Therefore, HUD had no contractual relationship with the owners with respect to prepayment rights. Id. at 1134-35. Second, the contract between the owners and HUD, the regulatory agreement, did not include any prepayment terms or right. Id. at 1131-32. Because HUD had no contractual relationship with the plaintiffs concerning a prepayment right and was not bound by any obligation to permit unfettered prepayment, the court's reliance on the deed of trust notes and the regulatory agreements as evidence of Congressional intent to permit prepayment is no longer valid.

With the exception of the language in 12 U.S.C. § 4122(a), the opinion does not provide any support for the conclusion that unfettered prepayment was part of Congress' intent. The court noted that LARSO's alleged "interference with prepayment rights rather craftily attempts to circumvent the original intent of the federal program and is thus contrary to the expressed intent of Congress." Id. at 67 (citing 12 U.S.C. §§ 4101(a), 4122). However, the legislative history does not clearly express a Congressional intent to permit unfettered prepayment or to allow owners to exit the federal program at market rates. See supra, § IV(A). Additionally, the court did not address the limitations on preemption in 12 U.S.C. § 4122(b) or the subsequent enactment of HOPE.[16]

---

[16] The court could not have addressed HOPE, since Congress enacted it after the court rendered its decision.

Overall, we do not agree that LIHPRHA, viewed within the overall statutory scheme, provides a basis for the preemption of LARSO. We find insufficient evidence of Congressional intent to support preemption in this situation. Although Cienega Gardens III assumes prepayment was a "Congressionally intended" right, 38 Fed. Cl. at 85 n.16, we are unable to find clear evidence of that intent in the NHA, 24 C.F.R. § 221.524, ELIHPA, LIHPRHA, HOPE, or their respective legislative histories. See supra, § IV(A).

**VI. Other defenses raised by Defendant**

The City asserts that the statute of limitations expired and that LIHPRHA does not provide a private right of action. Because we find that LARSO is not preempted, we need not reach these issues.

**VII. Disposition**

TOPA has not adequately demonstrated that LIHPRHA, within the statutory scheme of the NHA, preempts LARSO. In the alternative TOPA requests that it be permitted to charge the rental rates in the 1994 HUD-approved action plan. TOPA offers no authority to enforce an approved but unfunded action plan. Accordingly, TOPA's request to have its rents fixed at the amount under the 1994 action plan is hereby **DENIED**.

Counsel shall contact the court clerk to schedule a telephonic status conference with the court, within fourteen (14) days hereof, to discuss the status of this case in light of this order. The telephonic status conference shall also include counsel for the potential intervenors, Coalition for Economic Survival, Lourdes Lara and Tai Park.

IT IS SO ORDERED.

Dated: April 8, 2002

GEORGE H. KING
United States District Judge